## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

GERALD F. GERNADY,                    )
                                      )
          Plaintiff,                  )
                                      )      No. 02 C 8113
     v.                               )      Judge Joan H. Lefkow
                                      )
PACTIV CORPORATION,                   )
a Delaware Corporation,               )
                                      )
          Defendant.                  )

## MEMORANDUM OPINION AND ORDER

Plaintiff, Gerald F. Gernady ("Gernady"), brings this *pro se* action against defendant, Pactiv

Corporation ("Pactiv"), alleging that Pactiv violated the Americans With Disabilities Act ("ADA"),

42 U.S.C. §§ 12102 *et. seq.*, by failing to accommodate Gernady's Attention Deficit Disorder

("ADD"), depression, insomnia, migraine headaches, spinal disorders, and learning disabilities, by

discriminating against him in the terms and conditions of his employment, and by retaliating against

him for filing an EEOC complaint by terminating his employment.  Before the court is Pactiv's

motion for summary judgment.  For the reasons stated below, the court grants the motion.

## SUMMARY JUDGMENT STANDARDS

Summary judgment obviates the need for a trial where there is no genuine issue as to any

material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

To determine whether any genuine fact exists, the court must pierce the pleadings and assess the

proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part

of the record.  Fed R. Civ. P. 56(c) Advisory Committee's notes.  The party seeking summary

judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp.*

v. *Catrett*, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). In response, the nonmoving party cannot rest on bare pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). A material fact must be outcome determinative under the governing law. *Insolia*, 216 F.3d at 598-99. Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver* v. *Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the court must construe all facts in a light most favorable to the nonmoving party as well as view all reasonable inferences in that party's favor. *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 255, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).

## LOCAL RULE 56.1

Local Rule 56.1(a) provides that a motion for summary judgment must include, *inter alia,* a "statement of material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to a judgment as a matter of law." This statement of material facts "shall consist of short numbered paragraphs, including within each paragraph specific references to the affidavits, parts of the record, and other supporting materials relied upon to support the facts set forth in that paragraph." Part (b) of Local Rule 56.1 requires a party opposing summary judgment to file, *inter alia,* a concise response to the movant's statement of material facts. For purposes relevant here, that statement is required to include a response to each numbered paragraph in the moving party's statement, including in the case of any disagreement, "specific references to the affidavits, parts of the record, and other supporting materials relied upon." The rule is very clear that "all material facts set forth in the statement required of the moving party will be deemed admitted unless controverted by the statement of the opposing party." Local Rule 56.1(b)(3)(B).

2

Although Gernady submitted a response to Pactiv's Local Rule 56.1 Statement of Material Facts, his response is deficient in a number of respects. First, Gernady failed to provide a response to each paragraph.[1] In addition, Gernady failed to adequately deny certain portions of Pactiv's Local Rule 56.1 Statement of Material Facts by failing to provide any citation to the record.[2] Gernady also admitted certain statements of Pactiv but then improperly provided additional information.[3] *See McGuire* v. *United Parcel Serv.*, 152 F.3d 673, 675 (7th Cir. 1998). In addition, Gernady failed to state that certain facts were admitted or denied.[4] Gernady also cited to entire documents or groups of documents without adequately pin-pointing the specific source.[5] Gernady occasionally responded that he had no basis on which he could admit or deny the facts.[6] This is also improper. *Id.* Instead, a responding party must "deny the allegations in the numbered paragraph with citations to supporting evidence in the record." *Id.* The failure to comply with this rule results in an admission. *Id.*

Although Gernady is *pro se* and thus not held to the same standards expected of attorneys, Gernady is still required to comply with the Local Rules of the U.S. District Court for the Northern District of Illinois. *See Laramore* v. *City of Chicago*, No. 02 C 4220, 2004 U.S. Dist. LEXIS 18240, 2004 WL 2033005 at *2 (N.D. Ill. Sept. 10, 2004)(court deemed the defendant's Local Rule 56.1 Statement admitted to the extent supported by affidavits, record evidence or other supporting

---

[1]Specifically, Gernady provided no response to paragraphs 61, 152, 161-66. Thus, these facts are deemed admitted.

[2]*See, e.g.,* Plaintiff's Response Nos. 29, 30, 87.

[3]*See, e.g.,* Plaintiff's Response Nos. 7, 32, 37-39, 47, 49, 52, 60.

[4]*See, e.g,* Plaintiff's Response Nos. 36, 42-44.

[5]*See, e.g,* Plaintiff's Response Nos. 70, 82, 90.

[6]*See, e.g,* Plaintiff's Response Nos. 50, 58.

material where *pro se* litigant failed to comply with Local Rule 56.1)(collecting cases). Thus, to the extent that Gernady failed to respond adequately to material facts set forth in Pactiv's Local Rule 56.1 Statement of Material Facts, such material facts are deemed admitted to the extent they are supported by affidavits, record evidence, and other supporting materials. *See* Local Rule 56.1(b)(3)(B). *See also, e.g., Bordelon* v. *City of Chicago Sch. Reform Bd. of Trs.*, 233 F.3d 524, 529 (7th Cir. 2000). To the extent that the court is able to discern the specific location of cited references that lack pin-point citations, however, the court will consider such materials.

## FACTS STATED IN A LIGHT MOST FAVORABLE TO PLAINTIFF

### A. Background

Pactiv provides advanced packing solutions to its customers on a global basis. Gernady was hired by Pactiv on July 27, 1999 as a Deskside Support Technician/Network Analyst for its Headquarters Support team. The Headquarters Support team, which was part of Pactiv's Information Technology (IT) Division, offers support to employees encountering computer-related problems. During the interview process, Gernady was informed of the job requirements for this position, as well as its work hours, which were 9:00 a.m. to 5:00 p.m.

Prior to August of 2000, the Headquarter Support team included Senior Network Analysts, who were either Team Leads or Network Administrators; Network Analysts, who were members of the Response team or senior-level Deskside Support technicians; and Associate Network Analysts, who provided entry-level deskside support or background support roles. (Pl. Dec. at ¶ 5). Network Administrators and Team Leads provided network, server, and constant on-call support, twenty-four hours a day, seven days a week. *Id.* The Headquarters Support team included Kirk Osterman ("Osterman"), the Manager of Headquarters Support, and DeAnne Williams ("Williams") and Teresa

4

Conroy-Roth ("Conroy-Roth"), the Team Leads. Gernady was promoted to the position of a Senior Network Specialist (Network Administrator) on November 15, 1999 and received a pay increase and a job grade raise. At the time of his promotion, Gernady understood that there was an expectation that there be support coverage during all "work hours." (Def. L.R. 56.1 at ¶ 32).

## B.    Gernady's Attendance Prior to May 2000

On March 24, 2000, Osterman sent Gernady a memorandum that listed all of Gernady's absences from the prior six months, amounting to a total of five and three-quarters sick days. Osterman warned Gernady that his absence from work was becoming "excessive" and that additional absences could result in disciplinary action. (Def. L.R. 56.1 at ¶ 37). Gernady did not receive a suspension, he did not lose pay, and he suffered no other tangible job detriments as a result of this memorandum. (Def. L.R. 56.1 at ¶ 38). Osterman had issued similar attendance warnings to employees with fewer absences than Gernady. (Def. L.R. 56.1 at ¶ 39).

## C.    The May 2000 Meetings

### 1.    May 12, 2000

On or about May 12, 2000, Gernady and Osterman had a two-hour conversation in Pactiv's parking lot. During this conversation, Gernady informed Osterman for the first time that he suffered from ADD, insomnia, and dyslexia and that he was "almost always late for everything." (Def. L.R. 56.1 at ¶ 40). Gernady also told Osterman that his ADD and insomnia played a significant role in his ability to work and to arrive at work. (Pl. Dec. at ¶ 17).

Gernady believes that he also may have informed Williams that he suffered from ADD prior to May 12, 2000, but he cannot specifically recall whether or when he told Williams. Gernady had informed Dr. Joseph Berley ("Dr. Berley"), Pactiv's Director of Occupational Health Services, of

5

his ADD before he was hired by Pactiv. Osterman also was aware that Gernady went to the chiropractor on a weekly basis. (Def. L.R. 56.1 at ¶ 44).

2.    May 15, 2000

A few days later, on May 15, 2000, Osterman met with Gernady, Varun Budhiraja ("Budhiraja"), the new Network Administrator, and Williams to discuss a new work schedule for their team. Osterman confirmed that the core coverage hours for the network support team were from 8:00 a.m. to 5:00 p.m., Monday through Friday. (Def. L.R. 56.1 at ¶ 46). Gernady was assigned to work from 9:30 a.m. to 6:00 p.m., Tuesday through Friday, and 10:30 a.m. to 6:30 p.m. on Monday. The 10:30 a.m. start time on Mondays accommodated Gernady's standing appointment with his chiropractor. Gernady was the only employee in Pactiv's IT Division that was allowed a variation in his start time. In addition, Gernady and Budhiraja were informed that they were required to adjust their hours while the other was on vacation. (Def. L.R. 56.1 at ¶ 47). For example, Gernady was required to report to work by 8:00 a.m. rather than by 9:30 when Budhiraja was on vacation in order to provide coverage during the core hours.

Gernady did not have a problem with an approximate start time of 9:30 a.m., but he did have a problem with being required to arrive at work by 9:30 a.m. precisely. (Def. L.R. 56.1 at ¶ 49). Although Gernady arrived late for work on occasion, he was not disciplined every time. There were many occasions when he arrived a few minutes late for work and did not receive discipline or counseling. *Id.* On May 17, 2000, Williams notified Osterman that Gernady was unable to come in early during Budhiraja's vacation, which was scheduled for three weeks later. (Def. L.R. 56.1 at ¶ 50).

6

3.    May 19, 2000

On May 19, 2000, Gernady contacted Nikki Rubino ("Rubino"), the Human Resources Manager for Pactiv's IT Division, and requested an accommodation of his schedule. (Def. L.R. 56.1 at ¶ 51). Gernady asked for a flexible start time because of his physical and mental health problems and also asked that he be excused from a start time earlier than 9:00 a.m. while his team member was on vacation.    Almost immediately, Human Resources undertook efforts to determine what accommodations were medically necessary. (Def. L.R. 56.1 at ¶ 53).

4.    May 22, 2000

On May 22, 2000, Gernady met with Osterman and Carl Snyder ("Snyder"), Director of Client Support, to discuss Gernady's request for accommodations. Gernady told Osterman that he was unable to work at 8:00 a.m. because of his medical conditions. In addition, Gernady asked that Williams provide early morning coverage and that he be allowed to provide emergency coverage from his home over his DSL connection to Pactiv's network. (Pl. Dec. at ¶ 20).

**D.    Gernady's Medical Evaluations**

On May 24, 2000, Gernady called in sick with a migraine headache. Gernady notified Rubino that he was not feeling well, had been throwing up, had been experiencing migraine headaches, and had trouble sleeping. (Def. L.R. 56.1 at ¶ 56). Rubino then consulted with Osterman and Dr. Berley about Gernady's physical complaints. (Def. L.R. 56.1 at ¶ 57). Rubino, Osterman, and Dr. Berley decided to place Gernady on administrative leave with full pay as of May 25, 2000 while they investigated his request for accommodations in order to ensure that Gernady did not perform any tasks that he was incapable of performing. (Def. L.R. 56.1 at ¶ 58).

The following day, May 26, 2000, Gernady reported to Healthworks of Highland Park, Illinois for an evaluation by Dr. Richard Sturm ("Dr. Sturm"). Gernady authorized Dr. Sturm to speak with his three primary medical providers. Dr. Sturm contacted Gernady's psychiatrist, Dr. Barbara Smith ("Dr. Smith"). Dr. Smith indicated that, in her opinion, there was no compelling medical reason why Gernady was unable to begin his shift as early as 7:00 or 8:00 a.m. ten days per year. (Def. L.R. 56.1 at ¶ 61). She further indicated that Gernady was able to arrive punctually with a later start time, *i.e.,* 9:00 to 9:30 a.m. *Id.* In addition, Dr. Smith opined that there was no compelling medical reason why Gernady could not be "on-call" on occasion. *Id.* Based, in part, on Dr. Smith's opinion, Dr. Sturm determined that Gernady was able to work "without restrictions." (Pl. Ex. 5). Dr. Sturm did not contact Gernady's other medical providers. Gernady returned from Administrative Leave on June 5, 2000.

On June 8, 2000, Dr. Smith faxed a second letter to Dr. Sturm in which she included additional information that Plaintiff discussed with her on June 6, 2000. (Pl. L.R. 56.1 at ¶ 13). In this letter, Dr. Smith stated that Gernady was "quite disappointed that [she] did not convey other symptoms and problems from which he suffers that affect his ability to work." (Def. L.R. 56.1 at ¶ 63). Dr. Smith changed her medical opinion, advising Dr. Sturm that Gernady could "reliably" get to work between 9:30 and 9:45 a.m. but that he could not work shifts beginning between 7:00 and 8:00 a.m. (Def. L.R. 56.1 at ¶ 64). Dr. Berley telephoned Dr. Smith to discuss the recommendations contained in her June 8 letter on July 11, 2000. Dr. Smith testified that she felt "pressured" or "boxed in a corner" by Dr. Berley regarding the 8:00 a.m. start time. (Pl. L.R. 56.1 at ¶ 22).

Gernady also contacted his chiropractor, Dr. Timothy Voll ("Dr. Voll"), and his therapist, Kay Lofgren ("Lofgren"), asking them to submit documentation concerning his conditions. Dr. Voll

sent a letter to Dr. Sturm on June 10, 2000, informing Dr. Sturm that he had treated Gernady for chronic headaches, neck pain and thoracic spine pain since 1997. Dr. Voll also noted that Gernady's history of insomnia often triggered his headaches and that lifting heavy objects triggered his back pain. Dr. Voll did not recommend any job-related restrictions for Gernady. Lofgren also sent a letter in which she discussed Gernady's ADD, non-verbal learning disability, and marked sleep disturbance. Lofgren did not recommend any specific, job-related restrictions for Gernady but did state that she had "encouraged him to choose a career that allows some flexibility in terms of morning start times where he could best use his talents." (Def. L.R. 56.1 at ¶ 69).

On July 17, 2000, Dr. Smith sent a third letter to Dr. Berley in which she set forth a different opinion than her previous two letters. In this letter, Dr. Smith stated that Gernady required a later start of 9:30 a.m. for his regular schedule; that Gernady should not start work before 8:00 a.m. when on-call to cover another employee; and that Gernady should receive at least one week's advance notice when he needed to be on-call to cover another employee. (Def. L.R. 56.1 at ¶ 70). None of Gernady's physicians provided documentation that stated that Gernady was unable to arrive at work at 9:30 a.m. or that he could not arrive to work at 8:00 a.m. with advance notice. (Def. L.R. 56.1 at ¶ 71).

On June 23, 2000, Gernady returned to Healthworks for an evaluation by Dr. Sturm of his neck and back problems. Dr. Sturm scheduled Gernady for a functional capacity test on June 28, 2000. Dr. Sturm also requested that Gernady submit to x-rays. Gernady appeared for the functional capacity test on June 28 but asked that it be rescheduled because of his concerns that he might be injured before an upcoming vacation. The test was rescheduled for July 20, 2000. Gernady also did not schedule an appointment for the x-rays that Dr. Sturm requested.

9

Based upon his correspondence with Dr. Smith and the evaluation performed by Dr. Sturm, Dr. Berley concluded that Gernady was fully capable of performing his required duties and responsibilities as a Senior Analyst, with a few restrictions. These restrictions were that Gernady's work schedule would begin promptly at 9:30 a.m.; that Gernady receive one week of advance notice when he was required to arrive at work by 8:00 a.m. to cover for his co-worker; that Gernady not lift materials weighing more than 43 pounds from floor to waist height without assistance; and that Gernady not lift materials weighing more than 50 pounds from waist height and above without assistance. (Def. L.R. 56.1 at ¶ 85).

E.     **Gernady's Attendance During the Summer of 2000**

On June 14, 2000, Williams reminded Gernady that he was supposed to arrive at work by 8:00 a.m. to cover for Budhiraja while he was on vacation from Thursday, June 15 through Tuesday, June 20. The next day, June 15, Gernady did not show up for work until 8:30 a.m. He received an e-mail from Osterman reminding him that he was expected to arrive at 8:00 a.m. while Budhiraja was on vacation and notifying him that "an inability to meet coverage commitments [could] result in disciplinary action and or negatively impact [his] performance rating." (Def. L.R. 56.1 at ¶ 75).

On June 16, 2000, Gernady called in sick but later arrived at work at 1:30 p.m. following a chiropractor appointment. Gernady received another memo concerning his absences for two more sick days since February 18, 2000. This memo warned Gernady that additional absences would require disciplinary action or could affect his performance rating. (Def. L.R. 56.1 at ¶ 80). Gernady did not receive a suspension, loss in pay, or any other tangible job detriment because of this memorandum. (Def. L.R. 56.1 at ¶ 81).

On June 19, 2000, Gernady did not report to work at 8:00 a.m. but called in to report that he would be at work following his chiropractic appointment. Gernady arrived at work at about 10:00 a.m. Osterman sent Gernady another e-mail, reminding him that he needed to arrive to work at 8:00 a.m. the following day. Osterman and Rubino also called Gernady into a meeting that day. During the meeting, they informed Gernady for the first time that he would need to reschedule his chiropractor appointments on days when the other Network Administrator was out of the office.

On August 1, 2000, Gernady went fishing with Budhiraja and was absent from work for three hours. Although he knew that he was required to be accessible at all times, Gernady did not bring his phone or pager with him while he was gone. Budhiraja, however, had his phone with him while they were fishing. Williams spoke with Gernady about this absence the following day. Gernady admitted to being gone for over three hours. Gernady received two written warnings from Osterman as a result of this incident. One warning reminded Gernady that his continued absences from work were becoming excessive and that additional absences over the next twelve months would require disciplinary action and/or negatively affect his performance rating. (Def. L.R. 56.1, Ex. J). The other warning notified Gernady that his extended lunch and similar behavior was affecting his performance and could not be tolerated. He was warned that further incidents would lead to disciplinary action up to and including termination. (Def. L.R. 56.1, Ex. K).

F.    **Gernady Returns to Deskside Support**

On August 9, 2000, Osterman issued a memorandum to Gernady notifying him that he was being returned to his former position in Deskside Support. Because there were more Deskside Technicians than Network Administrators, more people were available to take Gernady's place and to assist him in the work that he did not do when absent from work. (Def. L.R. 56.1 at ¶ 93).

11

Gernady's hours remained the same as before with the exception that he no longer needed to come to work at 8:00 a.m. to cover for co-workers on vacation. The shift in position did not affect Gernady's title as Senior Analyst, salary, or job grade. The memorandum also notified Gernady that he was not allowed to bring personal equipment or software to work.

## G.    Gernady's FMLA Leave and Accommodations

Gernady took leave from August 10, 2000 through October 29, 2000. Pactiv granted Gernady's request for FMLA leave through September 25 and, upon Gernady's request, extended the leave until October 23, 2000. Dr. Smith submitted an FMLA certification form on Gernady's behalf in which she indicated that Gernady was unable to perform work of any kind because of his depression as of August 17, 2000. While on leave, Gernady looked for other employment and studied for the Cisco certification test.

On October 18, 2000, Gernady wrote a letter to Dr. Smith, begging that she help him in his request for accommodations. In this letter, Gernady outlined five accommodations that he would seek from Pactiv, including a flexible start time; being excused from taking a lunch break; being allowed to use his personal computer; being given a better workspace; and being given time off for therapy. Dr. Smith fully supported these accommodations. Gernady met with Burke Pollard, Pactiv's Director of EEO and Employment Litigation, Osterman, and Rubino to discuss Gernady's proposed accommodations on October 27, 2000 and returned to work on November 1, 2000.

Initially, Pactiv granted Gernady's first request that he be allowed to start work at 11:00 a.m. for the first twelve weeks after he returned to work following his FMLA leave. During his first few weeks back at Pactiv, however, Gernady arrived before 11:00 a.m. on several occasions without notifying Pactiv. Pactiv then changed Gernady's work hours to 10:00 a.m. to 6:00 p.m. in order to

12

keep track of his work hours for pay purposes. After a few weeks, Gernady's start time reverted back to 9:30 a.m. sharp. Pactiv did not grant Gernady's request that he be excused from taking a lunch break because of state wage and hour laws. Gernady also had requested that he be allowed to use his personal computer because it allowed him to "organize [his] life" and because he found it easier to work on two computers sitting side-by-side rather than switching between screens on one computer. Pactiv did not allow Gernady to use his personal computer at work because of security risks posed to Pactiv's computer system. Instead, Pactiv provided Gernady with a second computer and offered him a Palm Pilot to use as his calendar.

In addition, Gernady had requested a better work space with fewer distractions. In response to this request, Pactiv constructed cubicle extensions on his cubicle to reduce noise and distractions. Gernady had not wanted the cubicle extensions, preferring to use headphones or a white noise maker. Pactiv explained to Gernady, however, that his use of headphones would interfere with his ability to hear and respond to client calls and that the use of a white noise maker would interfere with the work space of his co-workers. Pactiv also granted Gernady's request that he be given time off to see his therapist. Following Gernady's return from FMLA leave, Osterman informed him that Pactiv would make a good faith effort not to assign him tickets that required lifting. If he was accidentally assigned a ticket that required lifting, Gernady was told that he should get someone to help him or to contact the Team Lead to reassign the ticket.

Gernady filed a charge of discrimination with the EEOC on November 7, 2000, claiming that Pactiv discriminated against him on the basis of his disability and retaliated against him. Pactiv submitted its response to Gernady's charge on December 22, 2000, including with its response two of three e-mails that Gernady had sent to Williams on October 5, 2000. In the second e-mail,

13

Gernady offered a bribe to Williams in exchange for her false testimony in the EEOC's investigation. In the third e-mail, Gernady assured Williams that he had been kidding when he asked her to lie to the EEOC investigators. Pactiv did not turn the third e-mail over to the EEOC.

**H.    Gernady's Termination**

In May of 2001, Gernady's new manager, Conroy-Roth, notified Gernady that if he needed to be out of the office for any reason, that he was to contact her directly. She specified that he was not to contact or leave messages with the Team Leads about his absences instead of clearing it with her. (Def. L.R. 56.1 at ¶ 130).

Gernady arrived twenty minutes late to work on January 16, 2001. While Pactiv determined that Gernady also was late on January 23, 2001, Gernady maintained that he had arrived to work early that day. Gernady received a written warning regarding his attendance from Conroy-Roth on January 24, 2001. This warning reminded Gernady that further incidents would "result in additional disciplinary action, up to and including termination." (Def. L.R. 56.1 at ¶ 127). On January 22, 2001, Gernady brought his personal computer to work even though he had previously been notified that he was not allowed to do so. The written warning from Conroy-Roth notified Gernady that another occurrence of bringing his personal computer to work would be considered "a deliberate attempt . . . to violate Pactiv's Security Awareness Guide." (Def. L.R. 56.1 at ¶ 128). This warning did not result in any tangible job detriments to Gernady.

On the afternoon of July 23, 2001, Gernady's wife telephoned him and reminded him that they were scheduled to attend a Lake County board meeting at 6:30 p.m. that night. At about 5:15, Gernady attempted to locate Conroy-Roth to let her know that he needed to leave early for personal reasons. He tried Conroy-Roth on her two-way radio, he tried her on her office telephone line, and

14

he repeatedly checked her office, but he could not find her. Gernady then told Karen Hiatt, a Team Lead, that he would be leaving the office early. Gernady left the office at around 5:15 p.m. and unexpectedly ran into Conroy-Roth in the parking lot. Gernady informed Conroy-Roth that he was leaving early because his wife had reminded him of a meeting that he needed to attend to protest new development in his area that could lower the property value of his home. (Def. L.R. 56.1 at ¶ 135). Conroy-Roth asked him how he intended to make up the time. Gernady offered to come into work early. Conroy-Roth informed him that it did not work that way, reiterating that any request for a change in hours needed to be communicated in advance. (Def. L.R. 56.1 at ¶ 137). She said that she was not concerned about his property value but that she was concerned about his being at work.[7] *Id.* Noting the emergency of the situation, however, Conroy-Roth said that she would allow Gernady to leave and make up the time accordingly. (Gernady Dec. at ¶ 52). Before Gernady got into his car to leave, he said "thank you" to Conroy-Roth, and she said nothing. (Gernady Dec. at ¶ 53).

On July 25, 2001, Gernady was informed that because he had left work early without the prior consent of Conroy-Roth, his employment was being terminated, effective immediately. (Def. L.R. 56.1 at ¶ 141).

## I. Gernady's Disabilities

Gernady suffers from back problems, insomnia, ADD, migraine headaches, dyslexia, a nonverbal learning disorder, and bipolar disorder. (Def. L.R. 56.1 at ¶ 142). Gernady was diagnosed with dyslexia in 1997, with depression in August of 2000, and with bipolar disorder in the summer of 2002. He has Syringomyelia, Schmorl's Nodes, atrophy to his spinal cord, compression fractures

---

[7]Pactiv further asserts that after Conroy-Roth informed Gernady that she was not concerned about his property value but that she was concerned about his being at work, Gernady shrugged his shoulders, got into his car, and drove away without Conroy-Roth's permission. *See* Def. L.R. 56.1 at ¶ 138.

in his thoracic spine, thoracic kyphosis and spondylosis, and suffers from degenerated centrally bulging disks in his cervical spine. He is able to bathe himself, feed himself, dress himself, cook for himself, drive, and walk without assistance, although many of these tasks take him longer to perform and cause him pain. Notwithstanding his back problems, migraine headaches, ADD, dyslexia, and nonverbal learning disorder, Gernady believes that he was "fully qualified" to perform his job at Pactiv and other jobs. (Def. L.R. 56.1 at ¶¶ 145, 154, 155, 170). In March of 2004, the Social Security Administration found that Gernady had been disabled since July 25, 2001.

According to Dr. Gerald Kane, Gernady's orthopedist, Gernady is capable of engaging in active employment, including working as a computer professional despite his back and neck problems. Dr. Voll also does not believe that Gernady is physically disabled or that Gernady was unable to perform his work duties at Pactiv. Dr. Voll believes that the treatment that he has provided to Gernady has stabilized his conditions. Similarly, Dr. Smith did not believe that Gernady was "disabled" while employed by Pactiv, meaning that Dr. Smith believed that Gernady was "able to perform his duties specifically in relation to work." (Def. L.R. 56.1 at ¶ 152).

Although Gernady has back and neck problems, Gernady has performed many strenuous household chores since February of 2000, including lifting and moving boxes, shoveling snow, moving his house and packing for a move, cutting tree limbs, trimming hedges, mulching, performing other landscape work, chopping firewood, wrapping heat vents with insulation, installing a vinyl floor, and painting his house. (Def. L.R. 56.1 at ¶ 148). Gernady also played softball for Pactiv's softball team on three occasions in 2001.

With regard to Gernady's insomnia, Dr. Smith did not believe that it was a consistent problem. She prescribed medication for his insomnia, finding that the medication had proven 100%

effective on some nights. Gernady also took a combination of prescription medications and over-the-counter sleep aids, allowing him to sleep consistently 90% of the time.

## J.    Pactiv's Enforcement of Its Policies Against Employees Other Than Gernady

Other members of the Headquarters Support Team received written warnings from Osterman regarding their excessive absences. On February 8, 2000, Williams received a written warning. John Fletcher ("Fletcher") received a written warning on May 17, 2000. Chad Young ("Young") received a written warning on October 11, 2000. Syed Bokhary ("Bokhary") received a written warning on October 11, 2000. Conroy-Roth received a written warning on October 30, 2000. Young, Bokhary, and Conroy-Roth received their warnings despite having taken fewer days off in a longer period of time than Gernady. Conroy-Roth terminated another employee for leaving work early without notification in March of 2001.

Pactiv also has terminated employees on its Headquarters Support team for violations of its attendance rules. John Scherfling was terminated after failing to report to work or to call in his absence after exceeding the number of his vacation days. Deborah Duncan also was terminated for excessive absences after missing thirteen days of work after working for Pactiv for less than one month.

## DISCUSSION

Gernady's Complaint alleges that Pactiv violated the ADA by failing to accommodate his ADD, depression, insomnia, migraine headaches, spinal disorders, and learning disabilities, by discriminating against him in the terms and conditions of his employment, and by retaliating against him for filing an EEOC complaint by terminating his employment. Pactiv raised a number of legal arguments with regard to merit of Gernady's claims. Gernady failed to respond to these arguments

in any manner. His entire "argument" consists of the following: "Plaintiff objects to Defendant's Motion for Summary Judgment and prays this Honorable Court finds the evidence in Plaintiff's response sufficient to hold this case over for trial." (Plaintiff's Objection to Defendant's Motion for Summary Judgment). This is not a sufficient legal argument.

Although the court liberally construes *pro se* filings, this liberal construction does not extend so far as developing and researching legal arguments for litigants proceeding without counsel. *Anderson* v. *Hardman*, 241 F.3d 544, 545 (7th Cir. 2001); *Mathis* v. *N.Y. Life Ins. Co.*,133 F.3d 546, 548 (7th Cir. 1998). Gernady still must challenge the arguments raised by Pactiv and demonstrate a genuine issue of material fact, which Gernady failed to do. Gernady's failure to respond to Pactiv's arguments results in a waiver of his opposition to these contentions. *See Volvosek* v. *Wis. Dep't of Agr., Trade and Consumer Protection*, 344 F.3d 680, 689 n.6 (7th Cir. 2003)(the total absence of argument regarding the plaintiff's termination waived consideration of the issue), citing *United States* v. *Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991). Even considering the merits of Gernady's claims, the court finds that Pactiv is entitled to summary judgment.

## A.    Disability Discrimination and Failure to Accommodate

The ADA prohibits discrimination "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees . . . and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a); *Basith* v. *Cook County*, 241 F.3d 919, 927 (7th Cir. 2001). In addition, "[t]he Act also provides that an employee discriminates against a qualified individual with a disability by 'not making reasonable accommodations to the known physical or mental limitations of an otherwise

18

qualified individual with a disability.'" *McPhaul* v. *Bd. of Comm'rs of Madison County*, 226 F.3d 558, 563 (7th Cir. 2000), quoting 42 U.S.C. § 12112(b)(5)(A).

To establish a *prima facie* case of discrimination, Gernady must show that (1) he is disabled within the meaning of the ADA, (2) he is qualified to perform the essential functions of his job either with or without reasonable accommodation, and (3) he has suffered from an adverse employment decision because of his disability. *Dvorak* v. *Mostardi Platt Assoc., Inc.*, 289 F.3d 479, 483 (7th Cir. 2002); *Bekker* v. *Humana Health Plan, Inc.*, 229 F.3d 662, 669-70 (7th Cir. 2000). Pactiv argues that Gernady cannot establish a *prima facie* case of an ADA violation because he cannot meet its first prong, that he is disabled within the meaning of the ADA.

Under the ADA, a disability is either (a) a physical or mental impairment that substantially limits one or more of the major life activities of an individual; (b) a record of such impairment; or (c) being regarded as having such an impairment. 42 U.S.C. § 12102(2). Gernady has set forth evidence showing that he actually suffers from physical and mental impairments rather than merely having a record of such impairment or being regarded as having such an impairment. Therefore, the court presumes that Gernady would proceed to prove that he has a disability under (a),which requires that Gernady show (1) he suffers from an impairment; (2) the impairment affects major life activities; and (3) the impairment "substantially limits" such major life activities. *Bragdon* v. *Abbott*, 524 U.S. 624, 631 (1998); *Sinkler* v. *Midwest Prop. Mgmt. Ltd. P'ship*, 209 F.3d 678, 683 (7th Cir. 2000).

The parties do not appear to dispute that Gernady's back problems, insomnia, ADD, migraine headaches, dyslexia, and a nonverbal learning disorder constitute impairments.[8] Thus, Gernady must show that his impairments substantially limit a major life activity. A major life activity is an activity of central importance to daily life. *Toyota Motor Mfg., Kentucky, Inc.* v. *Williams*, 534 U.S. 184, 197, 151 L. Ed. 2d 615, 122 S. Ct. 681 (2002). ADA regulations provide the following representative list of major life activities: caring for oneself, performing manual tasks, walking, seeing, hearing, breathing, learning and working. 29 C.F.R. § 1630.2(i). As discussed above, Gernady failed to make any argument in response to Pactiv's legal arguments. Thus, the court must speculate as to the life activities affected by Gernady's back problems, insomnia, ADD, migraine headaches, dyslexia, and nonverbal learning disorder. Gernady admitted that is able to bathe himself, feed himself, dress himself, cook for himself, drive, and walk without assistance. Thus, the remaining life activities that are affected by his impairments most likely include Gernady's ability to work, sleep, and learn.

---

[8]Although Gernady now suffers from bipolar disorder, he was not diagnosed with this disorder until the summer of 2002, which was after his employment with Pactiv had ended. None of the materials provided by Gernady demonstrated that he suffered from bipolar disorder during his employment with Pactiv. The court, therefore, will not consider his bipolar disorder when deciding Gernady's claims against Pactiv.

Since working,[9] sleeping,[10] and learning are major life activities, Gernady must show that he is "substantially limited" in his ability to work, sleep, and learn. The term "substantially limited" means

> Unable to perform a major life activity that the average person in the general population can perform; or significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1)(i). Factors to be considered in determining whether an individual is substantially limited in a major life activity include (i) the nature and severity of the impairment; (ii) the expected duration of the impairment; and (iii) the permanent or long term impact resulting from the impairment. 29 C.F.R. § 1630.2(j)(2)(i)-(iii).

In order to establish that he is substantially limited in his ability to work, Gernady must establish that he is "significantly restricted [from performing] either a class of jobs or a broad range of jobs in various classes." *Sutton* v. *United Air Lines, Inc.*, 527 U.S. 471, 482-83, 144 L. Ed. 2d 450, 119 S. Ct. 2139 (1999). Pactiv argues that Gernady cannot show that any of his impairments substantially limited his ability to perform his job at Pactiv or a broad range jobs. The court agrees. Gernady admitted that he was "fully qualified" to perform his job at Pactiv and other jobs, despite

---

[9]The court assume that working constitutes a major life activity. *See Peter* v. *City of Mauston*, 311 F.3d 835, 843 (7th Cir. 2002); *Amadio* v. *Ford Motor Co.*, 238 F.3d 919, 925 (7th Cir. 2001); *Moore* v. *J.B. Hunt Transp., Inc.*, 221 F.3d944, 953 (7th Cir. 2000).

[10]Although the Seventh Circuit and ADA regulations have yet to comment upon whether sleep constitutes a major life activity, this court agrees with other courts that have found that sleep is a major life activity. *E.g., Wendt* v. *Village of Evergreen Park*, No. 00 C 7730, 2003 WL 223443, at *6 (N.D. Ill. Feb. 3, 2003); *Silk* v. *City of Chicago*, No. 95 C 0143, 1997 WL 790598, at *7 (N.D. Ill. Dec. 17, 1997) ("This court, however, finds that sleep is a 'major life activity.' Sleep is a basic function that humans do as part of their daily life."); *see also, Pack* v. *Kmart Corp.*, 166 F.3d 1300, 1305 (10th Cir. 1999); *Kolecyck* v. *MCI Worldcom, Inc.*, No. 00 CV 8414, 2001 WL 245531, at *9 (N.D. Ill. March 12, 2001); *Mont-Ros* v. *City of West Miami*, 111 F. Supp. 2d 1338, 1354-55 (S.D. Fla. 2000).

21

his back problems, migraine headaches, ADD, dyslexia, and nonverbal learning disorder, and his psychiatrist, chiropractor, and orthopedist agreed.

In his declaration, however, Gernady stated:

> I am disabled, as I am generally limited in the number and type of jobs I am able to perform. I cannot work in the construction industry, I can no longer work in the restaurant business, I cannot do anything that requires sitting for more than an hour without frequent breaks, I cannot do anything that requires standing for more than 15 or 20 minutes, sometimes I cannot even stand for more than five minutes because of my back, and I cannot do anything that requires lifting more than five or ten pounds a couple of times a day.

Declaration of Gerald F. Gernady at ¶ 17.[11] Essentially, Gernady contends that he is restricted in his ability to perform "a broad range of jobs in various classes." In order to show that he is actually restricted from performing "a broad range of jobs in various classes," Gernady must demonstrate, at a minimum, that he was restricted in performing his previous job, "the job from which [he alleged he] was disqualified" or terminated because of his afflictions - that of a network administrator or deskside support person. *EEOC* v. *Rockwell Int'l Corp.*, 243 F.3d 1012 at 1017 (7th Cir. 2001), quoting 29 C.F.R. § 1630.2(j)(3)(ii)(A),(C). Since he admitted that he was able to perform his job at Pactiv and other jobs despite his impairments, however, Gernady cannot show that he was restricted in performing his previous job at Pactiv for purposes of showing that he is restricted from performing a "broad range of jobs in various classes." As a consequence, Gernady failed to show that he was substantially limited in his ability to work.

Similarly, Gernady did not show that he was substantially limited in his ability to sleep. When determining whether a plaintiff's impairment substantially limits a major life activity, the

---

[11]The court notes that Gernady failed to include or cite to this paragraph in his Local Rule 56.1(b)(3)(B) Statement of Material Facts that Indicate the Need for a Trial.

court must consider the plaintiff's condition as it exists after corrective or mitigating measures used to combat the impairment. *Id.* Dr. Smith did not believe that Gernady's insomnia was a consistent problem. The medication that she had prescribed for him had proven 100% effective on some nights. In addition, the combination of prescription medications and over-the-counter sleep aids allowed Gernady to sleep consistently 90% of the time. Since Gernady's insomnia was treatable on a consistent basis, Gernady did not show that his sleeping was substantially limited. Gernady also adduced no evidence that his ability to learn was in substantially limited in any way because of his impairments.

Because Gernady failed to establish that any of his impairments substantially limited any major life activity, Gernady cannot establish a *prima facie* case for his claims of disability discrimination and failure to accommodate. Pactiv is therefore entitled to summary judgment on Gernady's claims of disability discrimination and failure to accommodate.

**B.    Retaliatory Termination**

Gernady has presented no direct evidence that he was terminated in retaliation for filing a charge with the EEOC. Thus, he must proceed under the indirect burden-shifting method of proof established by *McDonnell-Douglas Corp.* v. *Green*, 411 U.S. 792, 804, 36 L. Ed. 2d, 93 S. Ct. 1817 (1973). *See DeLuca* v. *Winer Indus.*, 53 F.3d 793, 797 (7th Cir.1995) (applying the *McDonnell-Douglas* method to ADA cases). Under this method, a plaintiff must first establish a *prima facie* case of retaliation by showing "that (1) after lodging a complaint about discrimination, (2) only he, and not any otherwise similarly situated employee who did not complain, was (3) subjected to an adverse employment action even though (4) he was performing his job in a satisfactory manner." *Johnson* v. *Cambridge Indus.*, 325 F.3d 892, 897 (7th Cir. 2003), quoting *Stone* v. *City of*

23

*Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 642 (7th Cir. 2002). Under the indirect-method, the plaintiff does not need to show "even an attenuated causal link." *Haywood* v. *Lucent Techs.*, 323 F.3d 524, 531 (7th Cir. 2003). If the plaintiff establishes a *prima facie* case, "the burden shifts to the defendant to come forward with a legitimate, non-invidious reason for the adverse employment action." *Id.* "Once the defendant presents a legitimate, non-invidious reason for the adverse employment action, the burden shifts back to the plaintiff to show that the defendant's reason is pretextual." *Id.* At all times, the burden of persuasion rests with the plaintiff. *Id.*

While the Seventh Circuit has defined adverse employment actions "quite broadly," *Smart* v. *Ball State Univ.*,89 F.3d 437, 441 (7th Cir. 1996), an adverse employment action must be more than a "mere inconvenience or an alteration of job responsibilities" to be actionable. *Crady* v. *Liberty Nat'l Bank & Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993). A "materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Smart*, 89 F.3d at 441 (citation omitted).

Gernady filed his charge of discrimination with the EEOC in November of 2000. He was not terminated until July of 2001. During the interim period, Gernady received a single written warning on January 24, 2001 regarding his attendance and bringing his personal computer to work. This warning did not result in a reduction in Gernady's pay, any change in his title, a suspension, or any other tangible consequence. A written reprimand, however, does not constitute an adverse employment action unless it is accompanied by "tangible job consequences." *Oest* v. *Ill. Dep't of Corrections*, 240 F.3d 605 at 613 (7th Cir. 2001). In addition, while Gernady received other written

warnings about his attendance and was transferred back to his earlier position in Deskside Support before he filed the EEOC charge, none of these incidents resulted in a change in his job title, his pay, or his job grade. These warnings and the transfer also occurred before Gernady filed his EEOC charge. As a logical consequence, his filing of the charge could not have affected the earlier warnings and transfer, regardless of whether they constituted adverse employment actions. Thus, the only adverse employment action experienced by Gernady that could be construed as retaliation for the filing of the EEOC charge was his termination.

While Gernady suffered an adverse employment action in that he was terminated, his claim of retaliation fails because Gernady did not establish that he was treated less favorably than other similarly situated employees who did not complain. The evidence shows that Pactiv issued warnings about excessive absences to employees with fewer absences than Gernady and that Pactiv fired employees for leaving early without notification and for unexcused absences.

Moreover, Gernady did not establish that he was performing up to his employer's legitimate expectations. *See Haywood*, 323 F.3d at 531-32. Gernady acknowledged that his job required him to be available to meet the needs of Pactiv's employees in responding to their requests for computer-related assistance. On numerous occasions, however, Gernady reported late to work for which he received multiple warnings. Gernady also brought his personal computer to work after being told not to. He also returned to work late following a three-hour lunch spent fishing.

The last straw, however, was Gernady's early departure from work on July 23, 2001 without the prior approval of Conroy-Roth. Gernady asserts that he had Conroy-Roth's prior approval because he ran into her in the parking lot and that she said that he could leave. Even assuming, as the court must, that Gernady's version of events is true, he only received Conroy-Roth's approval

25

because he coincidentally happened upon her after he had already left work and after he failed to get in contact with her. While receiving Conroy-Roth's approval before he left the parking lot technically constitutes "prior" approval rather than approval after-the-fact, this approval violates, at a minimum, the spirit of the directive.[12] Moreover, Conroy-Roth reminded him during their conversation in the parking lot that any change in hours needed to be communicated in advance, which belies Gernady's contention that he had obtained "prior" approval. In any event, he was unavailable to respond to the needs of Pactiv's employees if any computer-related problems arose while he was out of the office. Thus, Gernady did not show that he was meeting Pactiv's legitimate expectations and his claim of retaliatory termination fails. The court, therefore, grants Pactiv's motion for summary judgment as to Gernady's claim of retaliatory termination.

## ORDER

For the reason stated, Pactiv's motion for summary judgment [#51] is granted. This case is terminated and all pending dates are stricken.

ENTER:

JOAN HUMPHREY LEFKOW
United States District Judge

Dated: January 24, 2005

---

[12]The court further notes that even if Gernady established a *prima facie* case of retaliation, he offered no evidence tending to show that Pactiv's legitimate, non-invidious reason for his termination, namely his leaving work early without the prior approval of Conroy-Roth, was pretextual. Even if he obtained Conroy-Roth's approval in the parking lot, Gernady presented no evidence that Pactiv did not honestly believe that obtaining "prior approval" by Conroy-Roth required something more than obtaining her acquiescence in the parking lot after having left the office for the day and that Gernady failed to obtain this "prior approval." *See Roberts* v. *Separators, Inc.*, 172 F.3d 448, 453 (7th Cir. 1999)("Where an employer has honestly described the motivation for its decision, that decision is not pretext for discrimination just because the plaintiff asserts the defendant's beliefs were inaccurate.").

26